UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION at LONDON

CIVIL ACTION NO. 07-321-GWU

PATRICIA BARRETT,                                                     PLAINTIFF,

VS.                    **MEMORANDUM OPINION**

MICHAEL J. ASTRUE,
COMMISSIONER OF SOCIAL SECURITY,             DEFENDANT.

### INTRODUCTION

The plaintiff originally brought <u>Barrett v. Barnhart</u>, London Civil Action No. 02-190-GWU (E.D. Ky.) to challenge the Commissioner's denial of her application for Supplemental Security Income (SSI) benefits dated December 10, 1999. After a period of reconsideration prompted by the undersigned's Memorandum Opinion, Order, and Judgment of April 9, 2003, the case is once again before the court on cross-motions for summary judgment.

### APPLICABLE LAW

Review of the Commissioner's decision is limited in scope to determining whether the findings of fact made are supported by substantial evidence. <u>Jones v. Secretary of Health and Human Services</u>, 945 F.2d 1365, 1368-1369 (6th Cir. 1991); <u>Crouch v. Secretary of Health and Human Services</u>, 909 F.2d 852, 855 (6th Cir. 1990). This "substantial evidence" is "such evidence as a reasonable mind shall accept as adequate to support a conclusion;" it is based on the record as a

1

whole and must take into account whatever in the record fairly detracts from its weight.  Crouch, 909 F.2d at 855.

The regulations outline a five-step analysis for evaluating disability claims.  See 20 C.F.R. § 404.1520.

The step referring to the existence of a "severe" impairment has been held to be a de minimis hurdle in the disability determination process.  Murphy v. Secretary of Health and Human Services, 801 F.2d 182, 185 (6th Cir. 1986).  An impairment can be considered not severe only if it is a "slight abnormality that minimally affects work ability regardless of age, education, and experience." Farris v. Secretary of Health and Human Services, 773 F.2d 85, 90 (6th Cir. 1985).  Essentially, the severity requirements may be used to weed out claims that are "totally groundless."  Id., n.1.

Step four refers to the ability to return to one's past relevant category of work, the plaintiff is said to make out a prima facie case by proving that he or she is unable to return to work.  Cf. Lashley v. Secretary of Health and Human Services, 708 F.2d 1048, 1053 (6th Cir. 1983).  Once the case is made, however, if the Commissioner has failed to properly prove that there is work in the national economy which the plaintiff can perform, then an award of benefits may, under certain circumstances, be had.  E.g., Faucher v. Secretary of Health and Human Services, 17 F.3d 171 (6th Cir. 1994).  One of the ways for the Commissioner to

perform this task is through the use of the medical vocational guidelines which appear at 20 C.F.R. Part 404, Subpart P, Appendix 2 and analyze factors such as residual functional capacity, age, education and work experience.

One of the residual functional capacity levels used in the guidelines, called "light" level work, involves lifting no more than twenty pounds at a time with frequent lifting or carrying of objects weighing up to ten pounds; a job is listed in this category if it encompasses a great deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls; by definition, a person capable of this level of activity must have the ability to do substantially all these activities. 20 C.F.R. 404.1567(b). "Sedentary work" is defined as having the capacity to lift no more than ten pounds at a time and occasionally lift or carry small articles and an occasional amount of walking and standing. 20 C.F.R. 404.1567(a), 416.967(a).

However, when a claimant suffers from an impairment "that significantly diminishes his capacity to work, but does not manifest itself as a limitation on strength, for example, where a claimant suffers from a mental illness . . . manipulative restrictions . . . or heightened sensitivity to environmental contaminants . . . rote application of the grid [guidelines] is inappropriate . . ." Abbott v. Sullivan, 905 F.2d 918, 926 (6th Cir. 1990). If this non-exertional impairment is significant, the Commissioner may still use the rules as a framework for decision-

making, 20 C.F.R. Part 404, Subpart P, Appendix 2, Rule 200.00(e); however, merely using the term "framework" in the text of the decision is insufficient, if a fair reading of the record reveals that the agency relied entirely on the grid.  <u>Ibid</u>.  In such cases, the agency may be required to consult a vocational specialist.  <u>Damron v. Secretary</u>, 778 F.2d 279, 282 (6th Cir. 1985).  Even then, substantial evidence to support the Commissioner's decision may be produced through reliance on this expert testimony only if the hypothetical question given to the expert accurately portrays the plaintiff's physical and mental impairments.  <u>Varley v. Secretary of Health and Human Services</u>, 820 F.2d 777 (6th Cir. 1987).

## DISCUSSION

On remand, the Administrative Law Judge (ALJ) noted that Mrs. Barrett had been awarded SSI benefits on a subsequent SSI application of November 30, 2001 (Tr. 71-5, 667-72), making the relevant period for purposes of this action December 1, 1999, the earliest date that she was eligible for SSI benefits based on her application of December 10, 1999, and November 30, 2001 (Tr. 26).

The primary reason for the court's remand of 2003 was to obtain copies of apparently missing pages from an evaluation by a treating psychiatrist, Dr. Rizwan Ali, upon which a Medical Expert (ME) had relied, and to eliminate any confusion on the issue of whether another treating source, Dr. Cecilia Carpio-Carigaba, was licensed to practice medicine.  The ALJ addressed these issues by obtaining the

missing pages, and also considered additional evidence submitted by the plaintiff. The ALJ received testimony from two MEs and a Vocational Expert (VE). Based on this testimony, he concluded that the plaintiff, although she had "severe" impairments including anxiety, depression, borderline intellectual functioning, low back pain secondary to degenerative disc disease of the lumbosacral spine with disc bulges at L4-5 and L5-S1, obesity, reactive airways disease, a history of peptic ulcer disease, and memory loss by history, was not under a disability at any time during the relevant period. (Tr. 29-34). The Appeals Council declined to review, and this action followed.

At the most recent administrative hearing, the ALJ asked the VE whether a person of the plaintiff's age, education, and lack of work experience could perform any jobs if she were limited to sedentary level exertion with a requirement to alternate sitting and standing at one-hour intervals, and also had non-exertional impairments as follows. She: (1) could not climb ladders, ropes, or scaffolds; (2) could occasionally bend, twist, balance, stoop, kneel, crouch, crawl, or climb stairs or ramps; (3) could have no exposure to concentrated dust, gases, fumes, smoke, temperature extremes, or excess humidity; (4) was restricted to simple, entry level work with one-, two-, three-step procedures; (5) no frequent changes in work routines; (6) no requirement for detailed or complex problem-solving, independent planning, or setting goals; (7) occasional interaction with the general public; and (8)

no requirement for advanced literacy. (Tr. 966-7). The VE responded that there were such jobs that such a person could perform, and proceeded to give the numbers in which they existed in the regional and national economies. (Tr. 967-8).

On appeal, this court must determine whether the hypothetical factors selected by the ALJ are supported by substantial evidence, and that they fairly depict the plaintiff's condition.

The plaintiff originally alleged disability due to arthritis, nerves, and breathing problems. She was eventually awarded benefits due to back pain as of November 30, 2001. (Tr. 71-5). Evidence from the period currently under consideration, or shortly before, includes office notes from Dr. Joseph P. Williams, a treating neurosurgeon, who evaluated Mrs. Barrett on referral from her family physician beginning in July, 1999. (Tr. 775). His examination noted apparent memory problems, as well as physical problems including a limited range of motion of the neck, tenderness at the L5-S1 level, spasms, and a positive test for arm drift in the right upper extremity. (Id.). Dr. Williams obtained MRI scans of the brain and cervical spine, which were negative, and an MRI of the lumbosacral spine which showed disc bulging at L4-5 and L5-S1 with no herniation. (Tr. 774). He prescribed only Glucosamine, and stated that he wished to avoid narcotics because of memory problems. (Id.). On April 12, 2000, he found no changes in the plaintiff's

examination and suggested that her problem was due to tight muscles "as we cannot find anything wrong with her back of any significance." (Tr. 773).

There is no evidence of a further visit to Dr. Williams until January 23, 2002, slightly after the end of the period currently at issue. At that time, however, Dr. Williams stated that Mrs. Barrett had a herniated disc impinging on the nerve root at L5-St along with "severe" degenerative disc disease at other levels, and was a candidate for surgical intervention. (Tr. 772). However, she did not have the actual MRI films available for review. His examination showed a completely absent reflex in both ankles and a "slight" knee jerk bilaterally. (Id.).[1] Mrs. Barrett was then seen by Dr. Richard Lingreen, an associate of Dr. Williams, who made essentially the same findings and prescribed Methadone. (Tr. 771). However, on April 8, 2002, Dr. Williams stated that while he had reviewed the MRI scan "performed in July, 2001" which appeared to show a collapsed L5-S1 disc and degenerative changes at L4-5 with an annular tear to the left side, he did not feel that she was a candidate for surgical intervention and recommended that she pursue "interventional pain management." (Tr. 770). No functional restrictions are suggested.

Other examiners during the relevant period included a family physician, Dr. Emanuel Yumang, who found only tenderness of the lumbosacral spine with no

---

[1] It is possible that an intervening office note had been lost, since Dr. Williams stated that he would renew a prescription for Oxycontin. (Tr. 772).

spasms on examination in September, 2000 (Tr. 317) and Dr. Rita Ratliff, who also examined the plaintiff lin September, 2000 and found no evidence for restrictions (Tr. 310-13).  Dr. Yumang referred his patient to the Pain Treatment Center, where Dr. Saadat Kamran did an evaluation in January, 2001.  His neurological examination was normal, and his musculoskeletal examination showed moderate to severe tenderness in the lower lumbar region and lower sacroiliac joints.  (Tr. 332-3).  He also felt that the plaintiff was suffering from migraine headaches, for which he prescribed medication, and he planned to perform facet joint injections for her back pain.  (Tr. 333).  The injections were performed both by Dr. Yumang (Tr. 370) and by Dr. Steven Hayes, another Pain Treatment Center physician (Tr. 374).  Dr. Hayes noted in May, 2001 that the plaintiff described "chronic excruciating pain," but he felt that she was "markedly overstating" her problem.  (Tr. 372).  His examination showed moderate tenderness at the lumbar midline area and the sacroiliac joints, but he found that Mrs. Barrett had a steady gait and stance and moved freely and without effort and no apparent pain.  (Id.).  Her neurological examination was normal, although she did complain of intermittent numbness in her two great toes.  He suggested obtaining a new lumbar MRI.  (Id.).  Although the actual report of this study does not appear to be in the transcript, it is presumably the MRI to which Dr. Williams later referred.  (Tr. 770).

07-321  Patricia Barrett

In February, 2002, approximately two months after the period presently at issue, Dr. Michael Dobbs conducted a consultative evaluation at which the plaintiff described radiation of pain from her back down her legs to her toes. (Tr. 731). She stated that she had recently been diagnosed with a herniated disc and would have low back surgery soon, but this evidence was not available to Dr. Dobbs. His examination included findings that the plaintiff denied having any sensation to light touch, pinprick, or vibration and reflexes were also difficult to elicit, but her motor strength was full, and coordination, gait, and station were normal. (Tr. 732). She had a limited range of motion of the shoulders and lumbar spine. (Id.). Dr. Dobbs opined that her history and examination were more consistent with musculoskeletal-type low back pain than pain from a herniated disc, but her examination was complicated and at times inconsistent. He advised getting MRI and EMG evidence, but in the meantime opined that Mrs. Barrett's ability to sit, stand, and move about was impaired because of pain. (Tr. 733).

At the administrative hearing, an orthopedic surgeon, Dr. Charles Hancock, testified as an ME. He stated that the best evidence of the plaintiff's condition was actually beyond a terminal date of November 30, 2001. (Tr. 956). He noted the findings of Dr. Lingreen in March, 2002 that Mrs. Barrett had a herniated disc with nerve root impingement, but noted that this is inconsistent with several subsequent physical examinations showing that she had very little radicular component to her

pain. (Tr. 957). Much later, on April 19, 2004, another MRI showed a disc protrusion and annular tear at L5-S1 (Tr. 958), but her condition did not meet or equal one of the Commissioner's Listings of Impairment. He noted that there had been several mentions of Mrs. Barrett having no motor loss, no atrophy, and no weakness, although there were reports both of reflex loss and of no reflex loss. (Id.). In his opinion, an annular tear was not equivalent to a herniated disc, the plaintiff did not have a surgical condition, and he did not see any significant neurological deficits. (Tr. 959-60). He did not express an opinion on functional limitations.

The plaintiff argues on appeal that the ALJ improperly evaluated the evidence from Dr. Williams. It is true that the ALJ did not mention the July, 2001 MRI, and relied only on the 1999 MRI showing degenerative disc disease and small bulges along with the statement by Dr. Williams shortly thereafter that she had no significant back problem. (Tr. 30, 33). The ALJ was incorrect when he stated that "it was not until April, 2004, a couple of years after the period under consideration, that a [MRI] scan showed 'severe' degenerative disc disease . . . ." (Tr. 30).

However, under the facts of this case, the error was harmless. The ME was aware of the earlier MRI and felt that it still did not establish that the plaintiff met or equaled a Listing. Moreover, Dr. Lynell Dupont, a state agency reviewing source, also reviewed the recent office note from Dr. Williams dated April 8, 2002, but

opined that the plaintiff would still be able to perform "light" level exertion with fewer non-exertional restrictions than given in the hypothetical question. (Tr. 796-802). No treating, examining, or reviewing source gave restrictions incompatible with the hypothetical question at any time during the period under review, and, therefore, the defendant could reasonably have relied on the testimony of the ME and the evidence of Dr. Dupont to carry his burden of showing that the plaintiff could perform work existing in the economy.

Regarding the plaintiff's mental functioning, her counsel argues on appeal that her IQ scores meet the Commissioner's Listing of Impairment 12.05B for mental retardation. Section 12.05, headed "Mental Retardation," provides for a finding of disability under certain conditions, including a "valid verbal, performance, or full scale IQ of 59 of less." However, the Listing also defines mental retardation as "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22." See Foster v. Halter, 279 F.3d 348, 354-5 (6th Cir. 2001).

In the present case, the plaintiff underwent IQ testing on three occasions, two of which took place during the relevant period. Dr. Vincent Dummer and Psychological Associate Renee LaBreche gave a short form of the Wechsler IQ Test on December 1, 1999 and obtained a full scale IQ score of 53, which was said

to be a valid estimate.  (Tr. 209-10).  Achievement testing showed first grade reading and second grade arithmetic skills.  (Tr. 210).  They concluded that while the plaintiff might be exaggerating her deficits somewhat, she did not appear to be malingering.

Psychologist James Leisenring administered the Peabody IQ Test in March, 2000 after an attempt to administer the Wechsler Adult Intelligence Scale produced scores too low to be meaningful.  (Tr. 242).  However, her score on the Peabody IQ Test was below 10, which would be in the range of profound mental retardation and would represent an individual who would generally require some form in institutionalization.  (Id.).  Mr. Leisenring noted that such a person certainly could not obtain a valid driver's license or operate a motor vehicle, as the plaintiff stated that she had done.  (Id.).  He also interviewed a neighbor and friend of the plaintiff who stated that Mrs. Barrett was able to read a newspaper.  (Id.).  Therefore, Mr. Leisenring diagnosed blatant malingering and estimated that the plaintiff's intellectual functioning was in the borderline to low range, albeit with a possible learning disability.  (Tr. 243).

Finally, Psychologist I.T. Baldwin examined the plaintiff in February, 2002 in connection with her subsequent application for benefits and also described Mrs. Barrett as malingering.  She stated that she had finished the ninth grade in Special Education classes, as well as some regular classes, and had to "study the book" to

get her driver's license.  (Tr. 735-6).  Testing on this occasion showed a full scale IQ of only 47, but Mr. Baldwin opined that the scores were not valid because Mrs. Barrett gave up easily on test items.  (Tr. 736-7).  Like Mr. Leisenring, he felt that Mrs. Barrett functioned in the low to borderline range on a day-to-day basis.  (Tr. 737).  His diagnostic impression was of malingering, and he assigned no restrictions.  (Tr. 738).

Dr. Neil Lewis, a licensed psychologist, also testified as an ME at the most recent administrative hearing.  Although he did not review the plaintiff's school records (Tr. 152-3), he opined that the plaintiff's IQ scores of 53 from Dr. Dummer were too low to be credible, and the achievement test scores obtained by this source were also most likely not valid, based on his review of the record as a whole and the assessments of other consultative examiners.  He specifically noticed that Mrs. Barrett had been able to take and pass the written driver's license test.  (Tr. 950).

Given the statements by the ME, as well as by Leisenring and Baldwin, the ALJ could reasonably have found that the IQ and achievement scores obtained by Dr. Dummer were invalid.  The specific functional restrictions given in the hypothetical question (Tr. 966-7) are not challenged by the plaintiff on appeal, and the court notes that none of the examining sources listed definite restrictions.  Mrs. Barrett's treating psychiatrist, Dr. Ali, assigned a Global Assessment of Functioning

07-321  Patricia Barrett

(GAF) score of 65 on her initial visit. (Tr. 218-19). A GAF score in this range reflects only mild symptoms. Diagnostic and Statistical Manual of Mental Disorders (4th Ed.--Text Revision), p. 34. This GAF score is consistent with the GAF score of 60 found by Mr. Leisenring (Tr. 244) as well as with Dr. Eardley's conclusions that Mrs. Barrett did not manifest a major mental illness (Tr. 287). Dr. Carpio-Carigaba provided a lower GAF score of 40 to 50 at the time of her initial consultation in October, 2000 (Tr. 320) but later notes do contain some indication that the plaintiff was feeling better (Tr. 725), and, in the absence of any specific limitations from this source the evidence does not clearly establish a greater level of restriction than found by the ALJ.

The decision will be affirmed.

This the 30th day of June, 2008.

Signed By:

*G. Wix Unthank*

United States Senior Judge